EX PARTE Adam Kelly WARD, Applicant

NO. WR–70,651–03

Court of Criminal Appeals of Texas.

March 14, 2016

David R. Dow, for Adam Kelly Ward.

## CONCURRING STATEMENT

ALCALA, J., filed a concurring statement.

Adam Kelly Ward, applicant, is scheduled to be executed on Tuesday, March 22, 2016, and a few days ago his attorneys filed the instant post-conviction application for a writ of habeas corpus and a motion to stay the execution. Applicant contends that his characteristics as a person with a severe mental illness make him categorically ineligible for the death penalty for the same reasons that the characteristics of intellectually disabled people or juvenile offenders make them categorically ineligible for the death penalty under the Eighth and Fourteenth Amendments to the United States Constitution. The questions before this Court are (1) whether applicant's present complaint may properly be considered in a subsequent habeas application; (2) if so, whether severe mental illness makes an offender categorically ineligible for a death sentence under the federal Constitution; and (3) if so, whether applicant's mental illness rises to the level that it is so severe that his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution. Because I find against him as to the first question, I do not reach the latter two questions. I, therefore, join this Court's order.

## I. Background

Around the time that applicant killed City of Commerce Code Enforcement Officer Michael Walker in June 2005, applicant's father believed that various city officials were conspiring together against their family to take their home and drive them out of town. According to the instant habeas application, applicant's father nurtured applicant's aggression and paranoid beliefs about government officials, and this resulted in applicant's assault on Walker. Applicant brutally ambushed Walker, who was attempting at the time to investigate a city-code violation, shooting him from a distance and then at close range in a cold-blooded attack.

In 2007, applicant was convicted and sentenced to death for the capital murder of Walker, and this Court resolved applicant's direct appeal and state habeas litigation within three years. This Court affirmed applicant's sentence on direct appeal in 2010. *Ward v. State*, No. AP–75,750, 2010 WL 454980 (Tex.Crim.App. Feb. 10, 2010) (not designated for publication). Also by the end of that year, this Court had denied relief on applicant's initial habeas application. *Ex parte Ward*, No.,651–02, 2010 WL 3910075 (Tex.Crim.App. Oct. 6, 2010).

In his state-court pleadings, applicant did not challenge the constitutionality of his sentence on the grounds presented in the instant application, but he did present that complaint to the federal district court when he filed a federal habeas application in 2011, an application that he amended in 2012. In denying applicant's federal habeas application, the federal district court described applicant's history of mental illness in great detail. *See Ward v. Stephens*, No. 3:10–CV–2101–N, 2014 WL 887440, at *12–18 (N.D.Tex. Mar. 6, 2014). The court observed that over the course of applicant's life, doctors had made multiple

diagnoses of applicant's mental illness, including bipolar disorder, personality disorder, schizoaffective disorder, depression, oppositional-defiant disorder, neuropsychological disorder, and "behavioral allergies." *Id.* The federal district court further described applicant's early childhood characteristics by stating,

As a child, he was aggressive towards fellow students, oppositional to extreme degrees, and diagnosed with a "parent-child problem with dysfunctional family" and oppositional-defiant disorder in the first grade. Ward was a loner who had difficulty forming friendships and was unable to feel empathy. By sixth grade, Ward was suspected of having delusional tendencies and was diagnosed with depressive disorder and personality disorder with narcissistic features. School psychologist Stephen Ball stated that Ward modeled the family dynamics and predicted that his delusional tendencies would become stronger and more entrenched as Ward aged. Although doctors had recommended that Ward's parents seek individual therapy and family therapy, they did not do so.

*Id.* (Citations to record omitted). During middle school, Ward "used degrading and vulgar language with teachers and peers, he went to class late and left early, and when his behavior was out of control, it required three male staff to restrain him." *Id.* At that time, Dr. Douglas Keene observed that applicant was "frankly psychotic." *Id.*

The federal district court further described applicant's characteristics around the time of high school by noting that he "spent most of his time with his father and did not date or go to parties." *Id.* The court observed that, by age fifteen, applicant "had problems with short-term memory and a narcissistic personality," and he "interpreted neutral things as a threat or personal attack." *Id.* During this time period, applicant's aggression escalated. *Id.* The federal district court explained that

in ninth grade [ ] he had a fight with one of his teachers. In tenth grade, he had problems with his neighbors that resulted in a criminal mischief charge, and by eleventh grade, he was accused of stabbing another student in the leg. After this, he was homeschooled until graduation. At age eighteen, he was charged with assault on a public servant and resisting arrest and search. By this time, he was diagnosed with bipolar disorder, depression, learning disorders, and attention deficit hyperactivity disorder, and was taking Depakote and lithium.

*Id.*

Applicant's mental illness and violent behavior continued in the years after high school until he committed this capital murder in his early twenties, as explained by the federal district court, which stated,

Ward attempted college but dropped out because he butted heads with the instructors, whom he described as deceitful and political. About three years later, Ward's father gave him a mild concussion by hitting him on the head with the butt of a revolver to keep him from going next door and killing the neighbors. Ward was never able to keep a full-time job. A jail screening upon his arrest in 2005 described Ward as depressed and hostile, with very little facial expression and tangential thinking. He had difficulty with impulse control, bad judgment, poor insight, trouble sleeping and eating, mood swings, and bizarre behaviors. While awaiting trial, Ward had "a myriad of jail incidents."

*Id.* at *13.

On appeal from the federal district court's denial of habeas relief, the Fifth

Circuit Court of Appeals observed, "Adam Kelly Ward has been afflicted with mental illness his entire life." *See Ward v. Stephens*, 777 F.3d 250, 253 (5th Cir.2015). Although it acknowledged applicant's longstanding mental illness, the federal appellate court denied a certificate of appealability, thereby agreeing with the federal district court's holding that binding Fifth Circuit precedent foreclosed applicant's argument that a person's severe mental illness could render him categorically ineligible for the death penalty. *Id.* at 269. The trial court then scheduled the now-impending execution date.

In the instant subsequent habeas application, applicant observes that he has exhibited signs of severe mental illness since almost the time of his birth. In the early years of his life, applicant was diagnosed with bipolar disorder and was twice hospitalized for multiple weeks at a time due to problems related to his mental illness. Applicant attended two elementary schools, each of which built a special "Time Out Box," or a small, padded isolation room, where he would frequently be placed when teachers determined that he was out of control. His screams could be heard from outside the room. During middle school, a neuropsychological evaluation detailed applicant's "rage episodes" and noted that he had a tendency to interpret incoming information as persecutory. It was predicted at that time that applicant would either be a victim of violence or would commit a violent assault upon another person. Although he initially attended classes at a high school, applicant's violent behavior resulted in him being homeschooled during what would have been his upper-class years.

After he stopped attending classes at his high school, applicant was mostly isolated at home with his father in an unstable situation. The instant application alleges that applicant's father was also mentally ill, that he believed that the government was conspiring against his family, that he failed to provide applicant with the treatment that he needed, and that he was a hoarder. Applicant's family home was filled almost to capacity with various objects, including forty-five to fifty guns inside a room devoted to the storage of firearms.

## II. Analysis

At this juncture, the legal question before this Court is not about the characteristics of the offense; rather, it is about the characteristics of the offender. If the offender had been a person who was intellectually disabled, then, according to binding Supreme Court precedent, that person would not be eligible for the death penalty. *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). And if the offender had been a person under the age of eighteen, then, according to binding Supreme Court precedent, that person also would not be eligible for the death penalty. *Roper v. Simmons*, 543 U.S. 551, 571, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The question, thus, is whether, under the same vein of reasoning as in *Atkins* and *Roper*, applicant has personal characteristics that render him constitutionally ineligible for the death penalty.

In his present application, applicant draws an analogy to *Atkins*, in which the Supreme Court held that, in light of evolving standards of decency, imposition of the death penalty on intellectually disabled offenders would violate the Eighth Amendment. *Id.* In reaching its determination in that case, the Supreme Court reasoned that intellectually disabled individuals "do not act with the level of moral culpability that characterizes the most serious adult criminal conduct" and, as such, the execution of such individuals would

not measurably advance the retribution and deterrence purposes served by the death penalty. *Id.* at 306, 318–20, 122 S.Ct. 2242. Applicant contends that these same rationales apply to bar the execution of a severely mentally ill person and that, similar to the Supreme Court's recognition of a national consensus against the execution of an intellectually disabled person in *Atkins,* a national consensus has emerged against the execution of severely mentally ill individuals.

Applicant also notes that, in addition to the prohibition against the execution of offenders who are intellectually disabled, the Supreme Court has held that other categories of offenders are categorically ineligible for a death sentence. In particular, he notes that the Supreme Court has held that the Eighth Amendment prohibits a death sentence for individuals who were juveniles at the time of their offenses because they lacked the culpability of adult offenders. *Roper,* 543 U.S. at 570, 125 S.Ct. 1183 (observing that the differences between juvenile and adult offenders "render suspect any conclusion that a juvenile falls among the worst offenders"; the "susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult") (citations omitted). Applicant also relies on *Roper* in support of his argument that severely mentally ill individuals should be categorically exempt from the death penalty.

Applicant's evidence observes that there is a developing national consensus against the imposition of the death penalty as a whole, but his evidence is not clear in separating such a general consensus against the death penalty from a more limited consensus against the execution of severely mentally ill people. According to applicant, twenty-four jurisdictions in the United States do not execute severely

mentally ill people for capital murder. He explains that nineteen states and the District of Columbia prohibit the death penalty, and four states currently have governor-imposed moratoriums on executions. He argues that the current status in which twenty-three states oppose the death penalty is the equivalent of the consensus that existed against the execution of intellectually disabled people that persuaded the Supreme Court to hold in *Atkins* that it was a violation of the federal Constitution to permit their execution. In *Roper,* the Supreme Court observed that, "[w]hen *Atkins* was decided, 30 States prohibited the death penalty for the [intellectually disabled]." *Roper,* 543 U.S. at 564, 125 S.Ct. 1183 (citing *Atkins,* 536 U.S. at 313–15, 122 S.Ct. 2242). Furthermore, applicant argues that the number of states that now prohibit the death penalty for intellectually disabled people is actually much higher, and is more likely thirty-five states. He explains that, in addition to the twenty-four jurisdictions that are now without the death penalty, eleven other jurisdictions have not executed anyone in at least ten years. As a practical reality, therefore, since 2010, it appears that the death penalty is utilized by only a third of the United States, or sixteen states, and applicant argues that this consistent drop in the number of states that carry out the death penalty reflects an emerging national consensus against the death penalty. In support of this line of reasoning, applicant relies on *Atkins,* in which the Supreme Court observed that "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change." *Atkins,* 536 U.S. at 315, 122 S.Ct. 2242.

But, before this Court may consider the merits of his contentions that are presented in a subsequent habeas application as compared to an initial application, the applicant must show that his complaint is not

subject to procedural default. *See* TEX. CODE CRIM. PROC. art. 11.071, § 5. Here, applicant has failed to do this. Applicant's sole complaint in the instant pleadings is that his mental illness rises to the level that it is so severe that his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution. He has not presented any complaint that the death penalty as a whole violates the Eighth and Fourteenth Amendments to the United States Constitution, yet almost all of his evidence addresses that matter rather than the particular question he has presented to this Court. Furthermore, although the record clearly shows that applicant has a longstanding mental illness, that evidence is inadequate to address applicant's particular complaint that, at the time of the offense, applicant had a severe mental illness that rose to the level that he should now be exempt from the death penalty for capital murder.

I note that these more particularized pleadings would be necessary in this type of case because of the complexity of the particular question before this Court, in light of the difficulties that courts across the nation have faced in applying the Supreme Court's *Atkins* decision to other cases. *See Atkins*, 536 U.S. at 321, 122 S.Ct. 2242. Even after *Atkins*, not all people with some level of intellectual disability are exempt from the death penalty. Rather, *Atkins* disallows the death penalty for those who have an intellectual disability that rises to the level that they are less morally culpable and thus should be exempt from the penalty. *See id.* Like the determination of the level of intellectual disability at which the death penalty becomes impermissible, the determination of the level at which a mental illness is so severe that it should result in an offender being categorically exempt from the death penalty would likely be an even more complex determination. And, like intellectual disability, the presence of a mental illness during the course of a person's lifetime would not exempt a person from the death penalty, but rather it would likely require evidence of a severe mental illness at the time of the commission of the offense. And, as is the case with intellectual disability, the preferred course would be for legislatures rather than courts to set standards defining the level at which a mental illness is so severe that it should result in a defendant being categorically exempt from the death penalty. Thus, although applicant has established that he has had a mental illness throughout his lifetime, I conclude that his pleadings have failed to provide adequate evidence to show that his mental illness was of the type and severity at the time of the commission of the offense that it would rise to the level of rendering him constitutionally categorically exempt from the death penalty.

I note that the matter of whether a severe mental illness would render a defendant categorically exempt from the death penalty is an even more complex decision than the one the *Atkins* Court decided about intellectual disability because Texas does provide relief in other related contexts for certain defendants who are mentally ill. The question is thus whether the federal Constitution would require more than the protections currently in place for the benefit of mentally ill defendants. A person may be found not guilty by reason of insanity based on his mental state at the time of the commission of the offense. *See* TEX. PENAL CODE § 8.01. A person may be found incompetent to stand trial based on his mental state at the time of the trial. *See Turner v. State*, 422 S.W.3d 676, 689 (Tex.Crim. App.2013); TEX.CODE CRIM. PROC. art. 46B.003. And a person who is incompetent or insane at the time of execution may not be punished with the death penalty. *Ford*

*v. Wainwright,* 477 U.S. 399, 417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); TEX. CODE CRIM. PROC. art. 46.05. Furthermore, although it does not specifically mention the topic of severe mental illness, the Texas mitigation special issue does more broadly permit a jury to decide that anything, which would necessarily include a defendant's severe mental illness, would be a proper basis for the jury to decline to impose the death penalty in a particular case. TEX. CODE CRIM. PROC. art. 37.071. I recognize that the mitigation special issue could be inadequate, however, not because it fails to permit consideration of a person's severe mental illness, but instead because it permits the jury to weigh any mental illness against the brutality of the offense. *See id.* This type of weighing against the brutality of the offense was deemed impermissible in *Atkins. Atkins,* 536 U.S. at 321, 122 S.Ct. 2242. Nevertheless, it is clear that courts and legislatures have determined that society has an interest in providing laws for special treatment of mentally ill defendants, but it is not as clear at this juncture, based on the instant pleadings, whether there should be an additional categorical prohibition against the death penalty for severely mentally ill offenders based on federal constitutional rights. Thus, I conclude that applicant's instant pleadings have failed to make an adequate showing that the federal Constitution requires more than what is currently provided for mentally ill defendants.

For these reasons, I join this Court's order dismissing the instant habeas application.

### *CONCURRING STATEMENT*

NEWELL, J., filed a concurring statement.

In this case, Applicant raises a claim in his subsequent application for habeas corpus relief that is identical to one raised in his federal habeas corpus applications. *Ward v. Stephens,* 777 F.3d 250, 269 (5th Cir. 2015). Applicant argued before the Fifth Circuit that in light of the United States Supreme Court decisions in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) the Eighth Amendment prohibits the execution of the severely mentally ill. The Fifth Circuit rejected this argument holding that "reasonable jurists could not debate whether Ward's death sentence violates the Eighth Amendment" in light of the Fifth Circuit's precedent. *Ward,* 777 F.3d at 269. The United States Supreme Court denied review of that decision. *Ward v. Stephens,* —— U.S. ——, 136 S.Ct. 86, 193 L.Ed.2d 76 (2015).

Additionally, this Court considered the identical claim in *Mays v. State,* 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010). In a unanimous opinion authored by Judge Cochran, this Court held that the Eighth Amendment does not categorically exclude defendants suffering from severe mental illness from the imposition of the death penalty. *Id.* Applicant does not point to any Supreme Court precedent announcing a contrary rule. *See Mays v. Stephens,* 757 F.3d 211, 219 (5th Cir. 2014). Even if we were to determine that Applicant properly raised these claims in a subsequent application for a writ of habeas corpus, the issue has been decided against Applicant.

However, I also agree with the Court that Applicant cannot satisfy the exceptions to the procedural bar against subsequent applications for habeas corpus relief. The United States Supreme Court decided both Atkins and Roper prior to Applicant's trial in this case. The Fifth Circuit noted when rejecting Applicant's application for federal habeas corpus relief that Applicant's mental health was the central issue throughout Applicant's trial and appeal.

Ward, 777 F.3d at 259. Applicant's diagnoses of anti-social personality disorder and bi-polar disorder were available at trial and presented to the jury. Consequently, this Court properly dismisses Applicant's subsequent application for habeas corpus relief because both the legal and factual claims raised in this application were available when Applicant filed the previous application. TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a)(1) (West 2015).1 This Court also properly dismisses Applicant's subsequent application for habeas corpus relief because he has failed to show that his death sentence violates the United States Constitution. TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a)(3) (West 2015); *Mays v. State*, 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010).

With these thoughts I join the Court's order.